# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6402 | **DATE** | 3/31/2003 |
| **CASE TITLE** | National Diamond vs. Flanders Diamond | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____ .

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .

(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. National Diamond Syndicate and Lewy Friedrich's motion for summary judgment (R. 30-1) is denied. Flanders Diamond USA and Kuwayama Europe's motion to exclude(R. 34-1) and strike (R. 34-2) is denied as moot. Defendants/Counter-Claimants motion for summary judgment of infringement and novelty of U.S. design patent 338,851 (R. 58-1) was denied by Judge Guzman's order of 7/11/02.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | MAR 3 1 2003 | | |
| | Notified counsel by telephone. | | date docketed | | 92 |
| | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | date mailed notice | | |
| | Copy to judge/magistrate judge. | | | | |
| TH ✓ | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 03 MAR 31 PM 1:59 Date/time received in central Clerk's Office | mailing deputy initials | | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL DIAMOND SYNDICATE, INC., | ) | |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | No. 00 C 6402 |
| | ) | |
| FLANDERS DIAMOND USA, INC., and | ) | |
| KUWAYAMA EUROPE, N.V., | ) | |
| | ) | |
| Defendants, Counterclaim Plaintiffs, | ) | |
| and Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LEWY FRIEDRICH, N.V., | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

DOCKETED

MAR 3 1 2003

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge

National Diamond Syndicate and Lewy Friedrich, N.V. have moved for summary judgment on the issues of invalidity, infringement and inequitable conduct relating to design patent no. 338,851 ("the '851 patent"). Flanders Diamond USA and Kuwayama Europe, N.V. have moved to exclude and strike certain materials included with the motion for summary judgment. For the reasons discussed below, the motion for summary judgment and the motion to exclude and strike are both denied.

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party that bears the burden of proof on a particular issue, however, may not rest on its pleadings but must affirmatively demonstrate that there is a genuine issue of material fact. *Id.* at 324, 106 S.Ct. at 2553. A mere scintilla of evidence in support of the non-movant's position is insufficient. *See Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

The Court "considers the evidentiary record in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor." *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). The Court accepts the non-moving party's version of any disputed facts but only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

## FACTUAL BACKGROUND

### A.    The Parties

Plaintiff and Counterclaim Defendant National Diamond Syndicate is an Illinois corporation. (*See* R. 47, Defs.' L.R. 56.1(b)(3) Resp., ¶ 1.) Counterclaim Defendant Lewy

Friedrich, N.V. is a Belgian corporation. (*Id.* ¶ 2.) Collectively, National Diamond Syndicate and Lewy Friedrich are referred to herein as "Plaintiffs."

Defendant, Counterclaim Plaintiffs, and Third-Party Plaintiffs Flanders Diamond USA and Kuwayama Europe, N.V. are, respectively, a New York corporation and a Belgian corporation. (*See* R. 47, Defs.' L.R. 56.1(b)(3) Resp., ¶¶ 3-4.) Kuwayama Europe is the owner of the '851 patent, and Flanders Diamond USA is an authorized licensee of the '851 patent. (*See* R. 30-1, Pls.' Exs. re Mot. for Summary Judgment, Ex. 23 at p. 53; *id.*, Ex. 6 at pp. 54-57.) Collectively, Flanders Diamond USA and Kuwayama Europe are referred to herein as "Defendants."

## B.    Diamond Cutting Terminology

Diamonds discovered in nature are commonly referred to as "rough diamonds" and must be cut and polished before they can be used in jewelry. (*See* R. 30-1, Pls.' Exs. re Mot. for Summary Judgment, Ex. 1 at pp. 7-13.)

A cut or polished diamond is made up of a number of individual facets and typically includes two main sections -- the crown (the top of the diamond) and the pavilion (the bottom of the diamond). (*See* R. 30-1, Pls.' Exs. re Mot. for Summary Judgment, Ex. 1 at p. 6.) Generally, the top surface of the crown includes a single flat facet known as the table facet. (*Id.*) The crown and the pavilion are divided by a narrow row of additional facets called the girdle. (*Id.*) Viewed from the top, the girdle defines the shape of the diamond. In other words, a diamond with a round girdle is referred to as a round cut diamond, and a diamond with an octagonal girdle is referred to as an octagonal diamond. (*Id.*)

One popular gemstone design is the Round Brilliant Cut, which typically features a round girdle, an octagonal table facet, and a total of 58 facets on the crown and pavilion. (*See* R. 30-1, Pls.' Exs. re Mot. for Summary Judgment, Ex. 1 at p. 108.)

## C.    The '851 Patent and the Flanders Brilliant Cut

In 1986, Johan d'Haene and Hirmoi Inui started Nippon Marketing Partners ("NMP") to market diamonds to the Japanese market. (*See* R. 48-1, d'Haene Dec., ¶ 3; R. 44-1, Inui Dec., ¶ 3.) NMP purchased diamonds and then cut and polished them for the Japanese market. (*See* R. 48-1, d'Haene Dec., ¶ 3.)

In 1987, NMP's Japanese customers requested a new gemstone with a cut similar to the Round Brilliant Cut. (*See* R. 48-1, d'Haene Dec., ¶ 4; R. 44-1, Inui Dec., ¶ 6.) In response to this request, Mr. d'Haene worked on several potential new diamond designs, including one design for a square diamond referred to as the Flanders Brilliant Cut. (*See* R. 48-1, d'Haene Dec., ¶¶ 5-6.) According to Mr. d'Haene, he developed the Flanders Brilliant Cut when he conceived of using the faceting from the Round Brilliant Cut on the pavilion of a square diamond -- a concept he referred to as "squaring" the Round Brilliant Cut. (*Id.* ¶¶ 6-7.) Because the Round Brilliant Cut facet design could not be imported exactly to a square diamond, Mr. d'Haene added four additional facets to the pavilion. (*Id.* ¶ 6.) Mr. d'Haene insists that he completed the design of the Flanders Brilliant Cut prior to March of 1988. (*See* R. 48-1, d'Haene Dec., ¶ 7. *See also* R. 44-1, Inui Dec., ¶¶ 6-7.)

On March 28, 1990, Mr. d'Haene filed a patent application for the Flanders Brilliant Cut with the United States Patent and Trademark Office ("the PTO"). (*See* R. 47, Defs.' L.R. 56.1(b)(3) Resp., ¶ 8.) Mr. d'Haene did not disclose any prior art to the PTO in connection with

4

his patent application. (*Id.* ¶ 34.) On August 31, 1993, the PTO issued the '851 patent for the

Flanders Brilliant Cut. (*Id.* ¶ 9.) Mr. d'Haene assigned the '851 patent to NMP, and Kuwayama

Europe acquired the '851 patent when it bought NMP. (*See* R. 30-1, Pls.' Exs. re Mot. for

Summary Judgment, Ex. 23 at p. 53; *id.*, Ex. 6 at pp. 54-57.)[1]

### D. The '293 Patent and the Petar Cut

In 1983, Milan Tankosic, of Petar's Jewellery, Ltd. in St. Catharines, Ontario, Canada,

developed a design for an octagonal gemstone referred to as the Petar Cut. (*See* R. 47-1, Defs.'

L.R. 56.1(b)(3) Resp., ¶ 11.) Mr. Tankosic filed a Canadian patent application for the Petar Cut

design, and on September 16, 1986, the Canadian Patent Office issued Canadian patent no.

1,211,293 ("the '293 patent"). (*Id.* ¶ 12.)

In 1984, Mr. Tankosic filed a United States counterpart to his Canadian patent

application, but the PTO rejected the application as unpatentable in view of existing prior art.

(*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 16.) Specifically, the patent examiner rejected Mr.

Tankosic's United States patent application under 35 U.S.C. § 103 as obvious in light of several

earlier gemstone designs. (*See* R. 30-2, Pls.' Exs. re Mot. for Summary Judgment, Tankosic

Dec., Ex. D.) Further, the patent examiner rejected Mr. Tankosic's application under 35 U.S.C.

§ 112 on the grounds that the claims were indefinite. (*Id.*)

The parties dispute the precise nature of Mr. Tankosic's Petar Cut design. Defendants

suggest that the Petar Cut design calls for elongated or emerald cut diamonds and is, therefore,

---

[1] Mr. d'Haene filed a second patent application for an elongated, emerald cut design the same day that he filed the application for the '851 patent. The patent for an elongated, emerald cut design, U.S. design patent no. 337, 742 ("the '742 patent"), was issued on July 27, 1993. (*See* R. 30-1, Pls.' Exs. re Mot. for Summary Judgment, Ex. 10.) The '742 patent is not directly at issue in this lawsuit.

different than the square Flanders Brilliant Cut. Plaintiffs contend that the Petar Cut design may be used with both square and elongated or emerald cut diamonds.

### E.     Marketing of the Petar Cut and the Flanders Brilliant Cut

In March 1987, Mr. Tankosic contacted the civil authorities in Antwerp, Belgium seeking contacts that might assist Petar's Jewellery's efforts to purchase and cut rough diamonds using the Petar Cut design. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 18.) In April 1987, Dirk Obbers, Director of Diamant Obbers G. & ZN ("Diamant Obbers"), responded to Mr. Tankosic and expressed interest in supplying Petar Cut diamonds. (*Id. See also* R. 30-2, Pls.' Exs. re Mot. for Summary Judgment, Tankosic Dec., ¶ 5; *id.*, Obbers Dec., ¶ 2.) Ultimately, Diamant Obbers agreed to purchase rough diamonds in Belgium on behalf of Petar's Jewellery and cut them according to the Petar Cut design. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 20.)

Beginning in April 1988 -- after Mr. d'Haene insists he completed his design of the Flanders Brilliant Cut -- Mr. Obbers showed Petar Cut diamonds to various potential customers, including Mr. d'Haene and NMP. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 23.) The parties agree that during this period Mr. Obbers showed Mr. d'Haene and NMP elongated Petar Cut stones, but it is disputed whether Mr. Obbers showed any square versions of that diamond design. (*Id.*)

Plaintiffs suggest that Mr. Obbers also showed Mr. d'Haene drawings of both square and elongated Petar Cut diamonds during the period from 1988 to 1990. Plaintiffs cite drawings that it claims Mr. Obbers provided to Mr. d'Haene, and these drawings do contain both square and elongated Petar Cut diamonds. (*See* R. 30-2, Pls.' Exs. re Mot. for Summary Judgment, Obbers Dec., Ex. D.) Defendants admit that Mr. d'Haene learned about the elongated Petar Cut design,

but they deny that he ever saw any drawings or examples of square Petar Cut diamonds. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 26. *See also* R. 48-1, d'Haene Dec., ¶ 61.)

Mr. Obbers hoped to sell Petar Cut diamonds to NMP and, together with Jan Storms, he formed a new company, Antwerp Diamond Services ("ADS"), for that purpose. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 23.) On October 23, 1988, ADS signed a one year contract to supply Petar Cut diamonds to NMP for eventual distribution in Asia and Australia. (*Id.* ¶ 24.)[2] The parties dispute, however, whether ADS ever supplied any Petar Cut diamonds to NMP.

Plaintiffs suggest that Mr. d'Haene, Mr. Obbers, and Mr. Storms decided to market Petar Cut diamonds under the name "Flanders Brilliant" and they point to various invoices showing that ADS supplied NMP with diamonds bearing that moniker from November 1988 to at least September 1989. (*See, e.g.*, R. 30-2, Pls.' Exs. re Mot. for Summary Judgment, Obbers Dec., Ex. K; *see also id.*, Obbers Dec., ¶ 9.) Defendants deny that these were in fact Petar Cut diamonds, and they deny that ADS manufactured any Petar Cut diamonds pursuant to the agreement with NMP. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶¶ 24-25; *see also* R. 45-1, Storms Dec., ¶¶ 32-33, 35.) Instead, Defendants maintain that the "Flanders Brilliant" diamonds referred to in the ADS-NMP invoices were diamonds cut according to Mr. d'Haene's own Flanders Brilliant Cut design. (*Id.*, ¶¶ 32-33, 35; R. 48-1, d'Haene Dec., ¶¶ 47-48.)

During 1988 and 1989, ADS placed advertisements in various trade industry publications for diamonds under the name "Flanders Brilliant." Mr. Tankosic saw one such advertisement

---

[2] After ADS reached the agreement with NMP, Mr. Obbers decided to end his arrangement with Petar's Jewellery. Sometime in June 1989, Mr. Tankosic sent a proposed written contract between Petar's Jewellery and Diamant Obbers, but Mr. Obbers refused to sign it. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 29.)

placed by ADS in the 1989-90 issue of *Kompass Diamonds*, a diamond industry trade publication. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 30; *see also* R. 30-2, Pls.' Exs. re Mot. for Summary Judgment, Tankosic Dec., ¶ 14.) Believing that the "Flanders Brilliant" was an unauthorized copy of his own Petar Cut design, Mr. Tankosic wrote a complaint letter to *Europa Star Diamond Intelligence Briefs*, another industry publication, which published the letter in its October 27, 1989 issue. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 30.)

On November 22, 1989, Mr. d'Haene sent a letter to the editor of the *Europa Star Diamond Intelligence Briefs* responding to Mr. Tankosic's allegations. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 31.) In that letter, Mr. d'Haene suggested that he developed the Flanders Brilliant Cut *after* he learned of Mr. Tankosic's Petar Cut:

> Flanders Diamond Exporters has been searching to develop a square brilliant form for well over two years. . . . We carefully studied the old cuts and the present day alternative cuts currently polished (princess, radian, quadrillion). We came across the Petar Cut mentioned in your article . . .
>
> We finally decided to try to fit the modern brilliant cut into a square shape. . . . The new Flanders Brilliant Cut was registered on September 22, 1988.

(R. 30-1, Pls.' Exs. re Mot. for Summary Judgment, Ex. 4.) Nonetheless, Mr. d'Haene denied that he had copied the Petar Cut design when he developed the Flanders Brilliant Cut:

> [W]e agree with Mr. Tankosic that his Petar Cut looks similar to the Flanders Brilliant in its elongated shape, but simple inspection will reveal that in reality we have here two different models with different angles, facets and brilliance (the table and culet are different, the stone has 4 more facets, and the angles of the halves of the crown side are different). In the search for new cuts, the laws governing the physics of diamond polishing are bound to lead

to similar results. . . . We strongly object against [sic] any accusation that we have infringed patent or copyright laws and we shall take the appropriate legal action against further defamation.

(R. 30-1, Pls.' Exs. re Mot. for Summary Judgment, Ex. 4. *See also* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 31.)

On November 25, 1989, Mr. Tankosic wrote to Mr. Obbers directly, accusing him of breaching Diamant Obbers' agreements with Petar's Jewellery. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 32.) Mr. Obbers responded to Mr. Tankosic's letter on December 12, 1989, denying that Diamant Obbers had produced any Petar Cut diamonds without authorization from Petar's Jewellery. (*Id.*) Mr. Obbers now suggests that he was lying and that ADS was in fact producing Petar Cut diamonds under the name "Flanders Brilliant." (*See* R. 30-2, Pls.' Exs. re Mot. for Summary Judgment, Obbers Dec., ¶ 11.) Defendants deny this. They contend that the "Flanders Brilliant" diamonds produced by ADS were diamonds cut according to Mr. d'Haene's own Flanders Brilliant Cut design. (*See* R. 45-1, Storms Dec., ¶¶ 32-33, 35; R. 48-1, d'Haene Dec., ¶¶ 47-48.)

On January 2, 1990, Mr. Tankosic wrote NMP directly, advising them of his past relationship with Diamant Obbers and suggesting that the diamonds supplied by ADS were unauthorized copies of his Petar Cut design. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 33.) Mr. d'Haene requested that NMP's attorney prepare the response to Mr. Tankosic's letter. (*Id.*) At the attorney's request, Mr. d'Haene obtained information concerning the Petar Cut design from Mr. Obbers at ADS. (*Id.* ¶ 26.) Mr. Obbers supplied Mr. d'Haene with a page describing the Petar Cut design taken from Mr. Tankosic's Canadian patent application. (*Id.; see also*

R. 48-1, d'Haene Dec., ¶ 39.) Mr. d'Haene claims that at the time he was unaware that this description of the Petar Cut design was taken from a patent application. (*Id.*)

### F.    Procedural History

On October 16, 2000, after receiving several letters from the Defendants accusing it of infringement and threatening legal action, National Diamond Syndicate filed the instant action, seeking a declaratory judgment that the '851 patent is invalid and unenforceable or, in the alternative, that National Diamond Syndicate has not infringed the '851 patent. (*See* R. 1-1, Pls.' Complaint.) On November 15, 2000, Defendants filed their answer and counterclaim as well as a third-party complaint against Lewy Friedrich, N.V. (*See* R. 5-1, Defs.' Answer and Counterclaim and Third-Party Complaint.)

On April 1, 2002, Plaintiffs filed their motion for summary judgment on the issues of invalidity, infringement and inequitable conduct. (*See* R. 30-1, Pls.' Mot. for Summary Judgment.) Defendants filed a motion to exclude and strike certain materials included with Plaintiffs' motion for summary judgment (*see* R. 34-1, R. 34-2, Defs.' Mot. to Exclude and Strike), which Judge Guzman elected to take under advisement and decide in connection with the motion for summary judgment. (*See* R. 35-1, May 6, 2002 Order.)

On June 7, 2002, Defendants filed their opposition to Defendants' motion for summary judgment, which included a "countermotion" for summary judgment. (*See* R. 42-1, Defs.' Opp. to Mot. for Summary Judgment and Countermotion for Summary Judgment; *see also* R. 43-1, Defs.' Opp. to Mot. for Summary Judgment on Inequitable Conduct.)  Plaintiffs moved to strike Defendants' "countermotion" for summary judgment and related portions of its response brief. (*See* R. 50-1, Pls.' Mot. to Strike.)  Judge Guzman granted Plaintiffs' motion to strike but gave

Defendants one week to file a motion for summary judgment and a separate response to the Plaintiffs' motion for summary judgment. (*See* R. 52-1, June 20, 2002 Order.)

Pursuant to Judge Guzman's order, Defendants filed a motion for summary judgment, (*see* R. 58-1, Defs.' Mot. for Summary Judgment), and a brief in opposition to the Plaintiffs' motion for summary judgment on June 27, 2002. (*See* R. 59-1, Defs.' Opp. to Mot. for Summary Judgment.) On July 9, 2002, Plaintiffs again moved to strike the Defendants' motion for summary judgement because Defendants failed to comply with Local Rule 56.1 and failed to properly notice the motion. (*See* R. 61-1, Pls.' Mot. to Strike.) Judge Guzman granted Defendants' motion to strike. (*See* R. 65-1, July 11, 2002 Order.) Thus, Plaintiffs' motion for summary judgment is the only such motion currently pending before this Court.[3]

## LEGAL ANALYSIS

## I.    CONSTRUCTION OF THE '851 PATENT

A design patent protects the novel, ornamental features of the design but not the functional features. *See OddzOn Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997). Thus, a design patent protects the overall ornamental visual impression of the design, rather than the broader general design concept. *See Contessa Food Products, Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002).

The Federal Circuit has held that design patents have a narrow scope, limited to what is shown in the drawings accompanying the patent application. *See Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998); *Elmer v. ICC*

---

[3]  The case was reassigned from Judge Guzman to this Court on August 30, 2002 pursuant to the mass reassignment order.

*Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995) *see also* 37 C.F.R. § 1.153(a) ("No description, other than a reference to the drawing, is ordinarily required" for design patents). In construing the claims of a design patent, however, the Court may also consider other intrinsic evidence such as the patent specification and the patent prosecution history. *See Hsin Ten Enterprise USA, Inc. v. Clark Enterprises*, 149 F.Supp.2d 60, 63 (S.D.N.Y. 2001).

In this case, the claim language is unhelpful. It reads simply: "The ornamental design for a gemstone, as shown." (*See* R. 30-1, Pls.' Exs. re Mot. for Summary Judgment, Ex. 9, at p. FLA 000825.) Likewise, the patent prosecution history offers little insight. The patent examiner issued two separate office actions, both requiring the applicant to provide shading to the design drawings (*see id.*, Ex. 17, pp. NDS 000045-52, NDS 000065-67), but did not cite any prior art as affecting the patentability of the design. Thus, the Court is left with the design drawings to perform the claim construction.

The parties propose competing claim constructions for the '851 patent. Plaintiffs suggest that the Court should construe the '851 patent as covering "[t]he illustrated eight-sided design for a faceted, transparent gemstone, having the particular facet configuration shown in the drawings, both with and without slight 'flared deviations' in the facet edges." (R. 30-1, Pls.' Mem. in Support of Mot. for Summary Judgment, at p. 30.) Defendants contend that the Court should construe the '851 patent as covering "an ornamental [square cut-cornered] design for a [brilliant faceted] gemstone, as shown." (R. 59-1, Defs.' Opp. to Mot. for Summary Judgment, at p. 7 (bracketed text in original; citation omitted). Further, Defendants urge that the '851 patent should cover gemstones with "substantially straight facet edge[s]," as opposed to perfectly straight facet edges. (*See id.*, at pp. 4-7.)

12

The Court construes the claims of the '851 patent as follows: The design drawings that accompany the '851 patent show a gemstone with an octagonal girdle. Viewed from above, the gemstone is a square with the corners cut off, rather than a rectangle with the corners cut off. The gemstone incorporates 61 total facets as shown, including 33 facets on the crown and 28 facets on the pavilion. The facet edges are straight and not visibly curved or flared.

## II.     PRIOR INVENTORSHIP

Section 102(f) provides that "[a] person shall be entitled to a patent unless . . . he did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f). In order to prevail under Section 102(f), "the party asserting invalidity must prove both prior conception of the invention by another and communication of that conception to the patentee." *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997). The party asserting invalidity must prove these elements by clear and convincing evidence. *Id.*

In this case, Plaintiffs suggest that summary judgment is appropriate under Section 102(f) because they contend that Mr. d'Haene has admitted that he developed the Flanders Brilliant Cut after seeing the Petar Cut design and because the two gemstone designs are so similar. In particular, Plaintiffs rely on Mr. d'Haene's November 22, 1989 letter to the editor of the *Europa Star Diamond Intelligence Briefs* where he suggested that he developed the Flanders Brilliant Cut *after* he learned of Mr. Tankosic's Petar Cut. (*See* R. 30-1, Pls.' Exs. re Mot. for Summary Judgment, Ex. 4.) Defendants have pointed to evidence, however, that Mr. d'Haene conceived of the Flanders Brilliant Cut independently, before he knew that the Petar Cut even existed. Indeed, Mr. d'Haene may have completed the design by March of 1988 -- before Mr. Obbers started

13

showing Petar Cut diamonds to potential customers. (*See* R. 47, Defs.' L.R. 56.1(b)(3) Resp., ¶¶ 10, 23; R. 48-1, d'Haene Dec., ¶¶ 5-7; R. 44-1, Inui Dec., ¶¶ 6-7.)

Plaintiffs complain that Mr. d'Haene's testimony is insufficient to create a genuine issue of material fact concerning the timing of his purported conception of the Flanders Brilliant Cut, citing *Price v. Sysmek*, 988 F.2d 1187 (Fed. Cir. 1993). Defendants, however, do not rely solely on Mr. d'Haene's testimony. They also cite the testimony of Mr. Inui who supports Mr. d'Haene's claim that he conceived of the Flanders Brilliant Cut sometime prior to March of 1988. (*See* R. 44-1, Inui Dec., ¶¶ 6-7.)

Because there is a genuine issue of material fact concerning whether Mr. d'Haene conceived of the Flanders Brilliant Cut independently before running across Mr. Tankosic's Petar Cut design, Plaintiffs are not entitled to summary judgment under Section 102(f). *See M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*, 68 F.Supp.2d 494, 500-01 (D.N.J. 1999) (denying summary judgment under Section 102(f) where the testimony of the inventor listed in the patent application was inconsistent on the question of inventorship).

## III.  ANTICIPATION

Sections 102(a) and 102(b) provide that a patent is anticipated and, therefore, invalid if the claimed invention was patented or described in a printed publication (1) before the invention

by the applicant, or (2) more than one year prior to the filing of the patent application. 35 U.S.C. §§ 102(a) and 102(b).[4] Anticipation requires "the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). *See also Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999) ("To invalidate a patent by anticipation, a prior art reference normally needs to disclose each and every limitation of the claim."). Anticipation is a question of fact, and thus, the Court may grant summary judgment on anticipation only when there is no genuine issue of fact that the prior art describes every element of the claimed invention. *See Trintec Industries, Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1294 (Fed. Cir. 2002); *see also In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997); *In re Graves*, 69 F.3d 1147, 1151 (Fed. Cir. 1995).

In this case, it is undisputed that the '293 patent could serve as the basis for anticipation under Sections 102(a) and 102(b) because Mr. Tankosic obtained the '293 patent before March 1988 when Mr. d'Haene invented the Flanders Brilliant Cut (*see* R. 48-1, d'Haene Dec., ¶ 7), and more than a year before March 1990 when Mr. d'Haene filed his own patent application. (*See* R. 47, Defs.' L.R. 56.1(b)(3) Resp., ¶ 8.) The question, however, is whether there is a

---

[4] Section 102(a) provides that "[a] person shall be entitled to a patent unless . . . the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a).

Section 102(b) provides that "[a] person shall be entitled to a patent unless . . . the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b).

genuine issue of fact concerning whether the '293 patent describes every element of the '851 patent. Plaintiffs suggest that there is no genuine issue of material of fact on this issue, but this Court disagrees.

Defendants have pointed to evidence suggesting that there are several differences between the design of the '293 patent and the design of the '851 patent and that, therefore, the former does not describe every element of the latter. In particular, Defendants emphasize that the design drawings that accompany the '293 patent depict a rectangular, Emerald cut gemstone rather than a square shaped gemstone with the corners cut off. (*See* R. 30-1, Pls.' Exs. re Mot. for Summary Judgment, Ex. 2, at p. LF 000139.) Indeed, Defendants suggest that the '293 patent specifically disclaims a square shaped gemstone with the corners cut off -- "the girdle comprising a set of girdle facets forming a straight-edged polygon the sides of which are *not* all equidistant to a common central point." (*Id.*, Ex. 2, at p. LF 000137 (emphasis added).) In addition, the design drawings depict facet edges with visible flaring or arcing rather than the straight facet edges shown in the '851 patent. (*Compare id.*, Ex. 2, at p. LF 000139, *with id.*, Ex. 9, at p. FLA 000826.) Finally, although the number of facets is apparently the same for the '293 patent and the '851 patent, the design drawings that accompany the two patents show that the pattern of facets on the pavilion is different for each design. (*Compare id.*, Ex. 2, at p. LF 000139, *with id.*, Ex. 9, at p. FLA 000826.)

In light of these differences, the Court concludes that there is a genuine issue of fact whether the '293 patent describes every element of the '851 patent, and thus, Plaintiffs are not entitled to summary judgment under Sections 102(a) and 102(b). *See Schumer v. Laboratory Computer Systems, Inc.*, 308 F.3d 1304, 1315-16 (Fed. Cir. 2002) (reversing summary judgment

16

on grounds of anticipation where fact issue existed as to whether prior art disclosed each and every claim of the patent).

## IV. INEQUITABLE CONDUCT

Because of the *ex parte* nature of the patent application process, applicants have an express "duty of candor and good faith" that governs their dealings with the PTO. *See* 37 C.F.R. § 1.56(a) ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO]"). *See also Fox Indus., Inc. v. Structural Pres. Sys., Inc.*, 922 F.2d 801, 804 (Fed. Cir. 1990) ("The duty of candor extends throughout the patent's entire prosecution history.").

This duty of candor and good faith requires that the applicant disclose to the PTO all information "material to patentability." *See* 37 C.F.R. § 1.56(a) (the "duty of candor and good faith . . . includes a duty to disclose to the [PTO] all information known to that individual to be material to patentability as defined in this section."). When the duties set forth in Section 1.56 are breached, the patent is said to have been procured through inequitable conduct and is, therefore, unenforceable. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1182 (Fed. Cir. 1995).

Where the inequitable conduct alleged is the failure to disclose relevant prior art to the PTO, the alleged infringer must prove that: (1) the prior art at issue is material; (2) the applicant had knowledge of the prior art and its materiality; and (3) the applicant failed to disclose the prior art with the intent to mislead the PTO. *FMC Corp. v. Manitowic Co., Inc.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987); *Videojet Sys. Int'l, Inc. v. Inkjet, Inc.*, No. 91 C 6284, 1996 WL 556740, at *4 (N.D. Ill. Sep. 27, 1996). The alleged infringer must establish the elements of inequitable conduct by clear and convincing evidence. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917

F.2d 544, 551 (Fed. Cir. 1990). If either materiality or intent are lacking, then no further analysis need be performed and Plaintiffs' motion for summary judgement on inequitable conduct must be denied. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997).

This Court concludes that Plaintiffs' summary judgment must be denied because there is a genuine issue of material fact on the question whether Mr. d'Haene acted with an intent to deceive the PTO. Plaintiffs argue that the high level of materiality of the '293 patent and the evidence that Mr. d'Haene was aware of the Petar Cut (if not the '293 patent itself) together are sufficient to create an inference of intent to deceive the PTO and entitle them to summary judgment. This Court disagrees.

Plaintiffs are correct that the courts must balance materiality and intent when weighing a claim of inequitable conduct and that, as a general principle, a lesser showing of intent is sufficient when the omission is highly material. *See GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1273 (Fed. Cir. 2001); *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439 (Fed. Cir. 1991). At the same time, however, the courts have held that there must be *some* threshold showing of intent to be balanced. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, (Fed. Cir. 2003) ("[W]e will not find inequitable conduct on an evidentiary record that is completely devoid of evidence of the patentee's intent to deceive the PTO."); *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002) ("Materiality does not presume intent, which is a separate and essential component of inequitable conduct.").

Direct evidence of intent or proof of deliberate scheming is rarely available in instances of inequitable conduct, but intent may be inferred from the surrounding circumstances. *See*

*Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed. Cir. 1989) ("Intent need not, and rarely can, be proven by direct evidence."). At the summary judgment stage, the Court must decide whether the evidence relating to intent makes the facts reasonably inferable either way, or whether the evidence is so one-sided that the factual issue of intent may be decided as a matter of law. *See Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

Significantly, there is evidence that supports d'Haene's contention that he believed that the Petar Cut design and the '293 patent were not material to the application for the '851 patent. First, although it is undisputed that Mr. d'Haene was familiar with elongated Petar Cut diamonds, it is unclear whether he ever saw drawings or examples of square Petar Cut diamonds. (*See* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 26. *See also* R. 48-1, d'Haene Dec., ¶ 61.) Second, there is evidence that Mr. d'Haene believed that there were significant differences between his Flanders Brilliant Cut and the Petar Cut design. Mr. d'Haene wrote to the editor of the *Europa Star Diamond Intelligence Briefs* that, although the Petar Cut resembled his own Flanders Brilliant Cut, the two designs were "different models with different angles, facets and brilliance (the table and culet are different, the stone has 4 more facets, and the angles of the halves of the crown side are different)." (*See* R. 30-1, Pls.' Exs. re Mot. for Summary Judgment, Ex. 4. *See also* R. 47-1, Defs.' L.R. 56.1(b)(3) Resp., ¶ 31.). Third, it is disputed whether Mr. d'Haene was aware that Mr. Tankosic held any patent protection over the Petar Cut design. Mr. d'Haene claims that at the time he was unaware that this description of the Petar Cut design was taken from a patent application. (R. 48-1, d'Haene Dec., ¶ 39.) Finally, there is evidence that suggests that Mr. d'Haene conceived of the design for the Flanders Brilliant Cut independently, before he learned of Mr. Tankosic's Petar Cut design. Indeed, Mr. Obbers began showing the Petar Cut

19

diamond design to customers beginning in April 1988 -- after Mr. d'Haene insists he completed

his design of the Flanders Brilliant Cut. (*See* R. 47, Defs.' L.R. 56.1(b)(3) Resp., ¶¶ 10, 23; R.

48-1, d'Haene Dec., ¶¶ 5-7; R. 44-1, Inui Dec., ¶¶ 6-7.)

Taking all reasonable inferences in the light most favorable to Defendants, the Court

concludes that Plaintiffs have shown at most that Mr. d'Haene acted with negligence in failing to

disclose the Petar Cut and '293 patent to the PTO. As the courts have recognized, even a finding

of gross negligence is insufficient to support an inference of intent to deceive the PTO. *See*

*Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988)

("[P]articular conduct [that] amounts to 'gross negligence' does not of itself justify an inference

of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence

indicative of good faith, must indicate sufficient culpability to require a finding of intent to

deceive.").

Ultimately, after an opportunity to weigh the credibility of the witnesses -- including, in

particular, Mr. d'Haene himself -- the trier of fact may conclude that Plaintiffs have proved that

Mr. d'Haene acted with the requisite intent to deceive the PTO. At the summary judgment stage,

however, the Court concludes that Defendants have raised a genuine issue of material fact on this

issue, and, therefore, Plaintiffs are not entitled to summary judgment on the issue of inequitable

conduct. *See Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d 1558, 1566 (Fed. Cir. 1987)

(disputed question of intent to deceive is not appropriate for summary resolution); *KangaROOS*

*U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1573 (Fed. Cir. 1985) (same).

# V.    INFRINGEMENT

The test of infringement in a design patent case is whether the accused product deceives the ordinary user, rather than an expert. *See Goodyear Tire & Rubber Co.*, 162 F.3d at 1117. The courts take into account similarities and differences in determining "'if in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other.'" *FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d 521 (Fed. Cir. 1987) (citation omitted). *See also Unette Corp. v. Unit Pack Co., Inc.*, 785 F.2d 1026, 1028 (Fed. Cir. 1986) ("Therefore, to find infringement, the accused [product] must be compared to the claimed design to determine whether the two designs are substantially the same.").

Plaintiffs do not contend that the diamonds they sell would appear different to the ordinary observer than the '851 patent design; instead, Plaintiffs suggest that there can be no infringement of the '851 patent because it is impossible to cut a diamond with "perfectly straight facet edge lines." (R. 30-1, Pls.' Mem. in Support of Mot. for Summary Judgment, at p. 45.) According to Plaintiffs, infringement is impossible because perfectly straight facet edge lines are merely theoretical and cannot be achieved in practice. (*Id.* at pp. 45-46.) Plaintiffs suggest, for example, that even diamonds sold by Defendants under the name "Flanders Brilliant" have flared facet edge lines. (*See* R. 30-2, Pls.' Exs. re Mot. for Summary Judgment, Zimmerman Dec., ¶¶ 5, 7.)

The scope of the '851 patent as construed by this Court, however, is not limited only to those diamonds with perfectly straight facet edge lines. As explained in Section I, *supra*, the

'851 patent describes a gemstone with facet edges that are straight and not *visibly* curved or flared. Contrary to Plaintiffs' suggestion then, infringement of the '851 patent is possible if Plaintiffs sell diamonds whose facet edges are not visibly curved (and otherwise appear to the ordinary observer to be substantially the same as the '851 patent design). Accordingly, Plaintiffs are not entitled to summary judgment on the issue of infringement.

## CONCLUSION

Plaintiffs' motion for summary judgment (R. 30-1) is denied. Defendants' motion to exclude and strike (R. 34-1, R. 34-2) is denied as moot.

Dated: March 31, 2003

AMY J. ST. EVE
U.S. District Court Judge